UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | |
|---|---|
| LYNN S., §§§ Plaintiff, §§§ v. § COMMISSIONER OF SOCIAL SECURITY, §§§ Defendant. § | Case # 1:20-cv-1915-DB<br><br>MEMORANDUM DECISION<br>AND ORDER |

LYNN S., §
 §
           Plaintiff, §
 §
v. § Case # 1:20-cv-1915-DB
 §
COMMISSIONER OF SOCIAL SECURITY, § MEMORANDUM DECISION
 § AND ORDER
           Defendant. §

## INTRODUCTION

Plaintiff Lynn S. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 14).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9, 10. Plaintiff filed a reply (ECF No. 12), and the Commissioner filed a sur-reply (ECF No. 15). For the reasons set forth below, Plaintiff's motion (ECF No. 9) is **GRANTED**, the Commissioner's motion (ECF No. 10) is **DENIED**, and this matter is **REMANDED** to the Commissioner for further administrative proceedings as set forth below.

## BACKGROUND

On April 12, 2016, Plaintiff protectively filed her DIB application alleging disability beginning July 3, 2017 (the disability onset date), due to (among other things) bipolar disorder and depression. Transcript ("Tr.") 12, 132. Plaintiff's claim was denied initially on June 21, 2016, after which she requested an administrative hearing. Tr. 12. On June 19, 2017, Administrative Law

Judge William M. Weir ("the ALJ") held a hearing in Buffalo, New York. Tr. 12. Plaintiff appeared and testified at the hearing and was represented by Keith Herald, an attorney. Lanell R. Hall, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id*. The ALJ issued an unfavorable decision on August 1, 2017. Tr. 12-22. On December 18, 2017, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1-6), and the ALJ's August 1, 2017 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

Thereafter, Plaintiff brought an action in this Court. *See* Case No. 1:18-cv-00241-LJV. In an order dated August 23, 2019, this Court found in favor of Plaintiff and remanded her case for further proceedings. Tr. 500-07. Specifically, the Court found that the ALJ's mental residual functional capacity ("RFC") was not based on medical opinion evidence or otherwise properly supported, as the ALJ provided no reasoning to link the medical evidence of record to the RFC limitations and appeared to rely on his lay assessment of the medical records. *Id*. The Court ordered the ALJ to "reconsider [Plaintiff's] RFC and support his determination with substantial evidence, by developing the record or otherwise." Tr. 507. Tr. 508. Thereafter, on September 9, 2019, the Appeals Council remanded the matter to the ALJ to update the record, offer a new hearing, and issue a new decision consistent with the Court's decision. Tr. 511.

The ALJ held a hearing on May 29, 2020 and a subsequent hearing on August 3, 2020. Tr. 389, 416-45, 446-58. Plaintiff appeared by telephone at both hearings and was represented by Nicholas DiVirglio, an attorney. *Id*. Medical expert Henry Urbaniak, M.D., an orthopedic specialist, also testified at the May 29, 2020 hearing. Also appearing and testifying at the August 3, 2020 telephonic hearing were psychological expert Gwendoline Dewitt, Ph.D., medical expert John F. Kwock, M.D., and vocational expert Larry Underwood. Tr. 389. On September 9, 2020,

2

the ALJ issued an unfavorable decision finding that Plaintiff was not disabled. Tr. 389-407. Thereafter, Plaintiff appealed the decision directly to this Court.

## **LEGAL STANDARD**

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II. The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational

requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## **ADMINISTRATIVE LAW JUDGE'S FINDINGS**

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his September 9, 2020 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since January 2, 2016, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has major depressive disorder; bipolar disorder; and chronic obstructive pulmonary disease ("COPD"), each of which constitutes a severe impairment (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. The claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)[1] except she should not be exposed to concentrated pulmonary irritants such as dust, fumes, gases, etc. She can do simple repetitive one-and two- step tasks. She cannot do complex work, defined as work involving multiple simultaneous goals or objectives or the need to independently set quantity, quality, or method standards.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on October 12, 1968 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age on October 11, 2018 (20 CFR 404.1563).).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2016, through the date of this decision (20 CFR 404.1520(g)).

Tr. 389-407.

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Accordingly, the ALJ determined that, for the application for a period of disability and disability insurance benefits, protectively filed on April 12, 2016, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 407.

## **ANALYSIS**

Plaintiff asserts two points of error. First, Plaintiff argues that the ALJ failed to follow the remand orders of this Court and the Appeals Council, and as a result, the ALJ's conclusions and findings, including his RFC finding, were not supported by substantial evidence. *See* ECF No. 19-1 at 17–22. Next, Plaintiff argues that the ALJ's rejection of the mental health opinions and evidence created an evidentiary gap in the record, resulting in a mental RFC finding that was based on a selective reading of the record and the ALJ's lay opinion, and therefore, not supported by substantial evidence. *See id*. at 22-30.

In response, the Commissioner argues that, because the ALJ supported his mental RFC finding with substantial evidence, he complied with the Court's order. *See* ECF No. 10-1 at 3, 7-26. Further, argues the Commissioner, the ALJ was not required to rely on any medical opinion in formulating Plaintiff's RFC, and properly considered the evidence as a whole, including objective medical evidence, Plaintiff's reported daily activities, the effects of her treatment, her instances of treatment non-compliance, and Plaintiff's statements regarding her ability to work, such as her testimony that she could probably perform a simple sit-down job. *See id*. (citing Tr. 46-47, 399). Furthermore, argues the Commissioner, the ALJ sufficiently articulated his reasoning for finding that Plaintiff could perform a range of simple, repetitive, one- to two-step tasks. *See id*.

The Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the ALJ's decision and the entire record, the Court finds that, while the ALJ further developed the record by obtaining opinion evidence from medical expert(s) and Plaintiff's treating psychotherapist as directed by the remand order, he substantially discounted or rejected these mental health opinions, appearing to craft a mental RFC largely based on his own lay interpretation of the medical findings and a selective reading of the record. As such, there was no competent medical opinion supporting the mental RFC finding, and there is reasonable basis for doubt as to whether the ALJ's determination that Plaintiff was capable of light work with the noted limitations was supported by substantial evidence. Tr. 396-405. Accordingly, remand is warranted.

The record reflects a lengthy history of mental health treatment, including hospitalizations for suicidal ideation. On January 3, 2016, Plaintiff was admitted to the Emergency Department ("ED") at Buffalo General Hospital ("BGH"), for treatment and evaluation after taking "some extra pills of Celexa and Amitryptilline to help her go to sleep quicker." Tr. 312-47. She also admitted taking cocaine prior to that. Tr. 313. Plaintiff was referred for inpatient psychiatric admission due to suicidal ideation. *Id*. Tr. 314.

After being medically stabilized, Plaintiff was transferred to Erie County Medical Center ("ECMC") on January 6, 2016, for inpatient psychiatric treatment and stabilization. Tr. 253-66. Plaintiff reported a history of bipolar disorder and depression, as well as a marijuana use disorder. Tr. 255. Plaintiff also reported a prior suicide attempt by medication in 2014, but she denied any other suicide attempts. Tr. 256. While she was not fully cooperative with providers at admission,

7

she became participative in treatment after one or two days and did well for the remainder of her stay, participating in individual, group, and milieu therapy.[2] Tr. 257. It was noted that Plaintiff had numerous psychosocial stressors that could not be resolved by treatment, including unstable housing, financial issues, drug use, limited special supports, and difficulty with children. Tr. 257, 264. She was determined to be in stable condition and discharged to a women's shelter on January 19, 2016. Tr. 257, 258.

On July 2, 2016, Plaintiff was again admitted to ECMC for "suicidal ideation with plan to overdose on medication." Tr. 353. Plaintiff reported that she was sober until April 2016, when she "relapsed on alcohol and crack cocaine," but she stated she had been sober since that time. *Id*. She reported current stressors including foreclosure of the home where she had been living and missing her youngest daughter, who she is able to see only intermittently under supervised settings. *Id*. Plaintiff also admitted she had been non-compliant with her medications. Tr. 356. Her medications were restarted, and she improved during her admission, including participating in therapeutic activities on her unit. *Id*. Plaintiff was discharged on July 6, 2016: at the time of discharge, her mental status examination was within normal limits, and she was released to return to school or work without restrictions. Tr. 357-58.

From approximately January 6, 2016 to March 17, 2020, Plaintiff received outpatient mental health treatment at ECMC for bipolar disorder, depression, suicidal ideation, overdose and other conditions. Tr. 348-64, 365-75, 839-97, 1075-1143. She also received mental health treatment and counseling at Endeavor Health Services from approximately February 2, 2016 to October 28, 2019, for bipolar disorder current or recent episode manic, moderate or mixed, severe;

---

[2] According to WebMD, milieu therapy is a safe, structured, group treatment method for mental health issues. It involves using everyday activities and a conditioned environment to help people with interaction in community settings. Milieu therapy is a flexible treatment intervention that may work together with other treatment methods. *See* https://www.webmd.com/mental-health/what-is-milieu-therapy (last visited Dec. 15, 2022).

8

cocaine use severe; and cannabis use, mild. Tr. 936-1074. She reported depression (mild to severe); hypomania or mania (mind racing), mood swings, anger issues, suicide attempts; sleep difficulty; little energy; appetite disturbance; anxious; suicidal thoughts; worry; substance history; healthy boundaries; stressors; and other symptoms. Tr. 936-1074, 987. Although she was noted to be compliant with treatment (Tr. 959, 1008), she also occasionally missed appointments (Tr. 961, 970, 1036).

In April 2019, Plaintiff reported to treating therapist Elizabeth Kern, LMHCP ("Ms. Kern"), at Endeavor Health, that she had severe difficulty concentrating for ten minutes; standing, standing up from sitting down; staying by herself for a few days; getting household work done as quickly as needed; and moderate difficulty in multiple other activities. Tr. 1023-25.

In July, August, September, and October of 2019, Plaintiff received Sustenna[3] injections with no adverse reactions reported. Tr. 1037, 1042, 1045, 1051, 1060. In December 2019 and February 2020, she reported suicidal ideation; and in April 2020, she denied suicidal ideation. Tr. 1182-87, 1197. In February 2020, her bipolar was mild, and she had psychosocial stressors of inadequate housing and low income. Tr. 1188. She reported anxiety with housing; excessive sleep and continued lack of motivation; and she did not think medications were effective. Tr. 1189.

On March 17, 2020, Plaintiff went to ECMC because of suicidal ideations. She had recently moved from an apartment to her daughter's house and denied any alcohol and illegal drug use. She was diagnosed with a bipolar disorder, appeared calm, cooperative, not aggressive or belligerent and she was not currently manic or psychotic. Tr. 1129. Plaintiff was transferred from ECMC to

---

[3] According to WebMD, Sustenna (generic name: paliperidone palmitate is a medication used to treat certain mental/mood disorders (such as schizophrenia, schizoaffective disorder). Paliperidone is an antipsychotic drug (atypical type). It works by helping to restore the balance of certain natural chemicals (neurotransmitters) in the brain. It can decrease hallucinations and help users think more clearly and positively, feel less agitated, and take a more active part in everyday life. *See* https://www.webmd.com/drugs/2/drug-152807/invega-sustenna-intramuscular/details (last visited Nov. 9, 2022).

9

Brylin Hospital for psychiatric inpatient treatment for suicidal ideation with plan to overdose, and bipolar disorder. Tr. 1128-60, 1180-1209. She was diagnosed with a bipolar disorder while in the depressed phase, adjustment disorder, generalized anxiety disorder, PTSD, chronic back pain, COPD, seasonal allergies, hyperlipidemia, and GERD. Tr. 1153, 1158. Mental status exams showed abnormalities like poor judgment; flat affect; tired of life and stressed; difficulty adjusting; noted drowsiness; and depressed. Tr. 1152-53. She continued to show depressive symptoms despite medication adjustments and underwent electroconvulsive therapy ("ECT")[4] treatment with nine inpatient treatments and was to continue outpatient ECT treatment. Tr. 1153-54. At discharge, she was instructed to continue Wellbutrin, Trazodone, and Hydroxyzine, and medical medications. Tr. 1154.

Plaintiff had a telephone encounter with therapist Ms. Kern on April 15, 2020, two days after her discharge. Tr. 1193. Plaintiff stated that "she thinks [the hospital visit] helped," and she no longer felt suicidal ideation. *Id*. She also stated that "now that she is home she [was] only going to be able to do [ECT] once per week." *Id*. She also reported having difficulty talking to Ms. Kern because she was feeling "tired and a little confused," which she said were side effects of the ECT treatment. *Id*. Ms. Kern had a brief (five minutes) follow-up encounter with Plaintiff on April 30, 2020, during which Plaintiff reported "there was nothing new." Ms. Kern noted that Plaintiff gave one-word responses such as "good" and "the same" and reported she was no longer attending ECT because it was too hard for her to get there. Tr. 1194.

On June 11, 2020, Ms. Kern completed a medical source statement related to Plaintiff's mental health. Tr. 1163-68. Ms. Kern noted that Plaintiff had been treated by Endeavor Health

---

[4] Electroconvulsive therapy is a medical treatment most commonly used in patients with severe major depression or bipolar disorder that has not responded to other treatments. *See* American Psychiatric Association; What is Electroconvulsive therapy (ECT)? Available at https://www.psychiatry.org/patients-families/ect (last visited Nov. 8, 2022).

10

since December 2018 for bipolar disorder and generalized anxiety disorder. Tr. 1163. She noted various signs and symptoms, including decreased energy, thoughts of suicide, and mood disturbance. Tr, 1164. Ms. Kern opined that Plaintiff was seriously limited or unable to meet competitive standards with maintaining attention and concentration for two-hour segments, maintaining regular attendance and being punctual, sustaining an ordinary performing at a consistent pace, accepting instructions and responding appropriately to criticism, carrying out detailed instructions, setting realistic goals or making plans, and dealing with stress of semi-skilled and skilled work. Tr. 1165-66. She also found Plaintiff was limited but satisfactory or unlimited in other areas. *Id*. She noted that she was unable to assess Plaintiff's absences. She noted that Plaintiff had been non-compliant with treatment or medication but indicated both "yes" and "no" to the question of whether this was part of Plaintiff's symptoms. Tr. 1167.

Psychological expert Gwendoline Dewitt, Ph.D. ("Dr. Dewitt"), testified at the August 3, 2020 hearing. Tr. 421-428, 1171-1179. Dr. Dewitt opined that Plaintiff met Listing criteria 12.04(A) and (C) of depression, citing to various exhibits in the record. Tr. 421-28. Dr. Dewitt found substance abuse was not material to Plaintiff's mental health impairments, and Plaintiff's symptoms persisted from 2018 until currently. Tr. 421. Dr. Dewitt found that Listing 12.04(A) was met in January 2016 with depression and suicide attempt, but she found that Listing 12.04(C) was not met at that time because it was not chronic for two years. Tr. 422-23. Dr. Dewitt found that Plaintiff met Listing 12.04(C) criteria in 2018 as her symptoms persisted. Tr. 425. Dr. Dewitt did not have an opinion as to the criteria for Listing 12.04(B), because there was no assessment that spoke to her functioning. *Id*. Per Listing 12.04(A)(1), Dr. Dewitt found that Plaintiff met: depressed mood, diminished interest, changes in appetite, sleep disturbance, decreased energy, feelings of guilt worthlessness, difficulty concentrating, and thoughts of suicide a few times; nearly

all of them. Tr. 425-26. Dr. Dewitt found evidence of marginal adjustment and minimal changes in environment was most clear from record in March 2020 that showed she was hospitalized again for suicide ideations, and this spoke "pretty loudly" to Plaintiff's inability to manage or adapt. Tr. 426. Dr. Dewitt opined that, even if there were occurrences of substance use in 2016, this may have been Plaintiff self-medicating, and Plaintiff's mental illness was "much beyond substance use." *Id*. Dr. Dewitt found diagnoses of history of bipolar disorder, generalized anxiety disorder, and major depression; and she found Plaintiff consistently met criteria for depression. Tr. 428.

A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all the relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). Although the RFC determination is reserved for the commissioner, *see* 20 C.F.R. §§ 404.1527(e)(2) and 416.927(e)(2), "an ALJ's RFC assessment is a medical determination that must be based on probative medical evidence of record . . . . Accordingly, an ALJ may not substitute his own judgment for competent medical opinion." *Dailey v. Astrue*, No. 09CV-0099 A M, 2010 WL 4703599, at *10 (W.D.N.Y. Oct. 26, 2010), *report and recommendation adopted*, No. 09-CV-99A, 2010 WL 4703591 (W.D.N.Y. Nov. 19, 2010) (citing *Lewis v. Comm'r of Soc. Sec.*, No. 6:00 CV 1225 GLS, 2005 WL 1899399, at *1 (N.D.N.Y. Aug. 2, 2005)); *see also Goldthrite v. Astrue*, 535 F.Supp.2d. 329, 339 (W.D.N.Y.2008) (Telesca, J.) ("An ALJ must rely on the medical findings contained within the record and cannot make his own diagnosis without substantial medical evidence to support his opinion."); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998).

As an initial matter, the Court notes some inconsistencies between the ALJ's citations to certain treatment records and what was actually written in the records cited. For instance, with respect to Plaintiff's July 2016 psychiatric admission for suicidal ideation, the ALJ stated she

"quickly improved" after restarting medications (Tr. 401), but the record cited actually says "she improved over time" (Tr. 356). When Plaintiff was hospitalized for nearly a month in March 2020 with diagnoses of bipolar disorder and suicidal ideation with plan, the ALJ stated: "once her medications were adjusted, she reported that, 'I feel much better.'" Tr. 402 (citing Tr. 1193). However, this page of the treatment record doesn't say this at all. In fact, it is record of a 15-minute telephone visit with therapist Ms. Kern on April 15, 2020, shortly after Plaintiff was discharged. Tr. 1193. The hospital treatment record actually states that Plaintiff continued to show depressive symptoms despite medication adjustments, and she underwent ECT treatment with nine inpatient treatments and was to continue ECT treatment on an outpatient basis. Tr. 1153-54. While these inaccurate citations to the record may seem minor, they call into question the credibility of the ALJ's analysis.

Even with respect to Plaintiff's April 15, 2020 telephone call with Ms. Kern, the ALJ inaccurately cited the record. The ALJ stated that Plaintiff told Ms. Kern that she felt better (Tr. 403), but all Plaintiff really said was that she "thinks that [the hospital visit] helped," and she no longer felt suicidal ideation. Tr. 1193. Although the ALJ noted that Plaintiff reported "being tired and a little confused (Tr. 403), he failed to note that Plaintiff told Ms. Kern she was having difficulty talking on the phone "due to being tired and a little confused which she said were side effects of the ECT" (Tr. 1193). Plaintiff had another telephone encounter with Ms. Kern a couple of weeks later on April 30, 2020. Tr. 1194. Although the ALJ accurately noted that Ms. Kern noted that Plaintiff "reported there was nothing new" (Tr. 403), Ms. Kern additionally wrote that Plaintiff had stopped going to ECT because it was "too hard for her to get there;" she gave one-word answers such as "good" and "the same;" and said she had nothing else to discuss with Ms. Kern.

13

Tr. 1194. Thus, the ALJ's characterization of Plaintiff's level of improvement following her hospitalization appears greater than Ms. Kern's notes seem to indicate. *See* Tr. 402, 1193, 1194.

The ALJ discounted Ms. Kern's opinion because she was not an acceptable medical source; he also stated that Ms. Kern greatly overstated limitations citing to Plaintiff's symptoms, intact attention and concentration on mental status examinations, and Plaintiff's activities. Tr. 404-05. However, Ms. Kern's mental status examinations also showed abnormalities such as mood dysfunction, flat affect; diminished insight and chronically limited insight and judgment; and other findings which the ALJ ignored. Tr. 257, 359-360, 848, 851, 853, 857, 866, 1132-1133, 1152-1553. While a [therapist's] opinion is not entitled to controlling weight, under Social Security Ruling ("SSR") 06–03p, the opinions of non-acceptable medical sources, who often have "close contact with . . . individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time," are to be considered as "valuable sources of evidence for assessing impairment severity and functioning." SSR 06–03p. Additionally, the regulations stated that depending on the facts of a particular case, "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an acceptable medical source, including the medical opinion of a treating source." *Id*.; *see also Mikrazi v. Colvin*, 2016 WL 5110035, *9 (W.D.N.Y. Sept. 21, 2016).

The ALJ also found medical examiner Dr. DeWitt's opinion was not consistent with the record, citing longitudinal evidence of Plaintiff's ability to live alone, look for improved housing, care for others, and perform activities of daily living. Tr. 404 (citing Tr. 847, 882, 995, 1030). First, with respect to housing, the record reflects that Plaintiff lived with family members, rented rooms in rooming houses, or lived in a shelter for most of the relevant period. At almost every doctor visit, she cited housing insecurity as a stressor. With respect to caring for others, the

activities cited by the ALJ were not performed regularly (babysitting grandchildren and helping care for her aunt) and do not seem comparable to sustained activities necessary to perform competitive work.

The ALJ also cites Plaintiff's inconsistent statements about her ability to work, noting that when asked during her 2017 hearing what would prevent her from performing a job sitting at a desk matching socks, Plaintiff replied, "boredom." Tr. 399. The Court notes, however, that this small snippet of testimony suffers from a lack of context. The ALJ asked Plaintiff if she could perform a job sitting at a desk matching socks if "it paid well and [she] had nothing else [she] had to do." Tr. 46-47. Plaintiff initially replied "boredom," as the ALJ cites, but when pressed further by the ALJ, Plaintiff replied, she "could probably" do such a job and then stated "maybe if I could sit down and stand." Tr. 47. Thus, Plaintiff's testimony was not exactly as the ALJ characterized. Plaintiff's response was not unreasonable under the scenario presented by the ALJ, and the Court will not fault Plaintiff for answering as she did.

In discounting the opinions of Dr. Dewitt and Ms. Kern, the ALJ also cites reports of some improvement in Plaintiff's symptoms, but these improvements were temporary in nature. The record shows that Plaintiff had periods of hypomania, mania, and multiple hospitalizations for suicide ideation and plan, as well as diverse treatment regimens, including multiple prescription medications, electroconvulsive therapy, and psychotropic injections, that were, at best, only temporarily successful.

In reaching a decision, the ALJ "must *both* identify evidence that supports his conclusion and 'build an accurate and logical bridge from that evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)) (emphasis in original). "[P]roviding 'an accurate and logical bridge' require[s] him to

15

confront the evidence in [a claimant's] favor and explain why it [is] rejected before concluding that her impairments [do] not impose more than a minimal limitation on her ability to perform basic work tasks." *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (quoting *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013)). "Where [courts] are 'unable to fathom the ALJ's rationale in relation to the evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ,' [courts] will not 'hesitate to remand for further findings or a clearer explanation for the decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)). Such is the case here.

As noted above, the ALJ miscited and mischaracterized evidence, particularly with respect to Plaintiff's improvement after a lengthy hospitalization that included ECT, and her alleged ability to look for improved housing and care for others. Furthermore, the ALJ rejected all mental opinions, many of which contradicted his conclusions, and failed to adequately explain his reasoning. As such, the ALJ's conclusions appear to be based on his own lay opinion and a selective reading of the evidence, and therefore, the ALJ's mental RFC finding was not supported by substantial evidence. There is simply no accurate and logical bridge between the evidence and the ALJ's conclusions as to Plaintiff's mental functioning. Accordingly, the Court remands this case so that the ALJ may address the deficiencies noted above. On remand, the ALJ. should thoroughly explain the findings related to the evidence of Plaintiff's mental impairments and the impact of such on Plaintiff's RFC.

Plaintiff has raised an additional argument in her Reply that the ALJ erred at step three in finding that her impairments did not meet Listing 12.04, specifically paragraphs A and C (*see* ECF No. 12 at 2-7), an argument which the Commissioner argues should be considered waived because Plaintiff failed to raise it in her initial briefing (*see* ECF No. 14 at 3-6). However, because the

Court has already determined that remand of this matter for further administrative proceedings is necessary, the Court declines to address this issue. *See, e.g.*, *Morales v. Colvin*, No. 13cv06844 (LGS) (DF), 2015 WL 2137776, at *28 (S.D.N.Y. Feb. 10, 2015) (the court need not reach additional arguments regarding the ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand"), *adopted*, *261 2015 WL 2137776 (S.D.N.Y. May 4, 2015).

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **GRANTED**, the Commissioner's Motion for Judgment on the Pleadings (ECF No. 10) is **DENIED**, and this matter is **REMANDED** to the Commissioner for further administrative proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g). *See Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000). The Clerk of Court is directed to enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE